UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRANK CRETELLA,

                    Plaintiff,

        -v-                                              No. 08 Civ. 1566 (LTS)(THK)

NELSON LIRIANO,
MARGARET SPANIOLO,
MARIA LOCCISANO, and
BERGDORF GOODMAN, INC.,

                    Defendants.

_____

OPINION AND ORDER

APPEARANCES:

DA'TEKENA ADOKIYE BARANGO-                LAW OFFICES OF ANDREW P. SAULITIS
TARIAH, ATTORNEY AT LAW                   P.C.
25 Bond Street                             By: Andrew Peter Saulitis, Esq.
Brooklyn, NY 11201                        555 Madison Ave.
                                          New York, NY 10036

*Attorney for Plaintiff*                  *Attorney for Defendants*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiff Frank Cretella ("Plaintiff"), a white male who was over the age of 40 at all relevant times, brings this action against Bergdorf Goodman, Inc. ("Bergdorf"), Nelson Liriano ("Liriano"), Margaret Spaniolo ("Spaniolo") and Maria Loccisano ("Loccisano") (collectively "Defendants").[1]  He alleges that, after he was hired by Bergdorf as a sales associate in September 2003, Defendants engaged in discriminatory employment practices by reassigning him to a lower-paying position in November 2003 and terminating him in December 2006.[2] Plaintiff brings claims of race and age discrimination and retaliation, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623 et seq., Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y. Charter & Admin. Code § 8-107.  Plaintiff also brings a claim for unpaid compensation pursuant to N.Y. Labor Law § 198 et seq.

The Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

Defendants move for summary judgment dismissing Plaintiff's complaint in its entirety.  The Court has considered thoroughly all of the parties' submissions and arguments in

---

[1]   Plaintiff identifies Liriano as "Luriano" and Loccisano as "Locisano," but the record indicates that the spelling used in this Opinion and Order is correct.

[2]   In his opposition papers, Plaintiff indicates that he has withdrawn his claims to the extent they are premised on allegations that Defendants failed to promote him to certain positions, and to the extent that they are premised on a theory of hostile work environment.  (Opp'n at 16, 18.)

connection with the motion.  For the following reasons, Defendants' motion is granted.

BACKGROUND

The following material facts are undisputed unless otherwise stated.[3]  On September 15, 2003, Plaintiff Frank Cretella began working at Bergdorf as a sales associate in the center pit area on the first floor at the Men's Store.  He received an hourly wage plus commission.  Defendant Nelson Liriano was his supervisor at that time.

*Assignment to Right Pit Area in November 2003*

On November 2003 Plaintiff was reassigned to the right pit area on the first floor. While Plaintiff's pay and commission rate remained the same, the right pit area, according to Plaintiff, was "less productive in terms of sales" than the center pit area, and the transfer therefore effectively resulted a reduction of Plaintiff's commission income.  (Deposition of Frank Cretella, annexed to Affirmation of Da'Tekena Barango-Tariah, Esq., dated April 6, 2009, as Ex.

---

[3]    On May 12, 2009, the Court granted in part Defendants' motion for sanctions, and indicated that it would not rely on Plaintiff's proffer of Matthew Anderson's testimony in considering Defendants' motion for summary judgment.  (See Docket Entry No. 48.)

Because its analysis of the remaining portions of the record lead the Court to the conclusion that Defendants are entitled to summary judgment, the Court has also considered whether inclusion of the deposition testimony would augment the record sufficiently to establish any genuine issue of material fact. Having considered thoroughly the entire record in this light, the Court concludes that the Anderson testimony, which consists in principal relevant part of allegations that certain individuals who have not been shown to have been involved in the complained-of employment actions made remarks indicative of race or age bias, is insufficient to raise any genuine issue of material fact.

1, and annexed to Declaration of Andrew Saulitis, Esq., dated Mar. 9, 2009, as Ex. H (hereinafter "Cretella Dep."), at 133:4-16).  Plaintiff was not replaced in the center pit area after he was assigned to the right pit area.  However, Plaintiff's reassignment permitted associates already working in the center pit area potentially to earn more commission income due to less competition from other center pit sales associates.  (Cretella Dep. at 137:2-139:12.)  At the time Plaintiff was reassigned, at least one Hispanic employee, Luis Zambrano ("Zambrano"), and one white employee, Michael Sirico ("Sirico"), were working in the center pit area (id. at 138:4-16), and the right pit area staff included at least one Hispanic employee, Albert Meliana.  (Id. at 135:25-136:11.)  Plaintiff testified that Liriano assigned Plaintiff to the right pit area in order to allow Zambrano to make more sales and therefore additional commission, but Plaintiff provides no evidence to substantiate his assertion concerning Liriano's motivations.  (See, e.g., at 137:17-20 ("I saw that that was one of [Liriano's] goals, he was not subtle about it.".).)

        In February 2004, Plaintiff was reassigned to the furnishings area and, at or about that time, Liriano was promoted to be group manager of the second floor and was no longer Plaintiff's direct supervisor.

### *Annual Reviews and Warnings, and the EEOC Charge*

        Bergdorf expected its sales associates to maximize sales volume, but it also expected its associates to send handwritten, personalized thank you notes to customers making purchases for at least 50% of all sales.  Records of these thank you notes were kept to monitor compliance.  (Decl. of John Marazio dated Mar. 9, 2009, ¶ 7.)  Sales associates were also expected to solicit, obtain and compile the customer's name, address and telephone number, on

85% of all sales.  This latter practice was called "clientele capture."  (Id. ¶ 8.)

      Plaintiff's first annual review was completed on July 15, 2004.  According to the Sales Associate Evaluation form, which was signed by a manager named Aguid Vasconez, Plaintiff exceeded the "Sales Productivity" goal.  However, Plaintiff only achieved a clientele capture rate of 52%, and Plaintiff also fell short of the "Thank You Notes" goal of 642, by issuing only 412 thank you notes.  Both the "52%" and "412" figures were circled.  Plaintiff received a rating of "3," which represented "at standard" on a scale of 1 to 5, for most of the other categories, but received a rating of "2," which represented "development required," under the categories, "Convert returns into sales," "Write and send thank you notes," "Follow clientele capture standards" and "Look for and develop new business opportunities."  He received an overall evaluation rating of "3."  The form was signed by Plaintiff and dated July 15, 2004.  (Barango-Tariah Aff. Ex. 2 at 82-83.)

      On June 5, 2005, Plaintiff was issued a "Preliminary Warning" by Defendant Liriano.  It indicated, "For the months of February, March, April and May [2005] Mr. Cretella did not follow Clientele standards . . . ."  (Barango-Tariah Aff. Ex.2 at 112.)  It continued: "Adding false information is a direct violation of company policy and procedures regarding Clientele.  He must also address his lack of effort regarding his floor maintenance and visual standards.  Frank has also failed to meet the Clientele capture rate goal of 85% and Thank You Card goal of 50% of all transactions for the following months."  (Id.)  Following this statement was a chart listing each month from August 2004 to May 2005, identifying the respective numerical thank you card goals and the actual number of thank you cards sent, as well as the clientele capture rate for each month.  According to the warning, Plaintiff only exceeded the

thank you card goal for the month of May 2005, and did not achieve the 85% clientele capture rate for any month.  (Id.)  Next to the months of February to May 2005, the clientele capture rate was listed as "Inaccurate %."  Plaintiff signed his name under the statement, "I acknowledge this Warning and will correct this work related behavior.  I am aware of company rules and understand that further disciplinary action will result if deficient performance continues," and dated his signature June 5, 2005.  (Id.)

        A month later, on July 13, 2005, the evaluation form for Plaintiff's second annual review was completed.[4]  According to the form, which was drafted and signed by Liriano, Plaintiff again exceeded the "Sales Productivity" goal.  (Barango-Tariah Aff. Ex. 2 at 113-114.) However, Plaintiff fell short of the thank you note goal of 1491, sending out only 739, and an "NA" appeared next to Plaintiff's listed clientele capture rate.  Liriano was unable to recall at his deposition why an "NA" was inserted there.  Plaintiff received more "2's" than in the previous annual review, in almost half of the categories.  He again received "2's" in the "Write and send thank you notes" and "Follow clientele capture standards" categories, and his overall evaluation rating on the 2005 form was "2."  Each rating was indicated by a circle around the appropriate number, but an incomplete or partially erased circle is found around the number "3" in the overall evaluation rating category, and similar incomplete or partially erased circles are found around the number "3" in some of the other categories in which Plaintiff received a "2" rating. Liriano checked the "Performance deficient - Specify Follow up" category and indicated that he would follow-up with Plaintiff in 30 days.  Plaintiff refused to sign this form.  (Id.)

---

[4]      As the Court explains infra, Plaintiff asserts that evaluation forms were not reviewed with him until some unspecified time well after the forms were drafted.

Soon thereafter, on August 18, 2005, Liriano issued Plaintiff a second "Preliminary Warning."  (It is not clear whether this warning was issued as a result of the July 2005 annual review itself or as a result of a follow-up meeting after the annual review.)  It indicated that Plaintiff had failed to achieve the proper clientele capture percentage of 85% and that he had failed to meet his thank you card goal of 50% of all transactions for the 2005 review period (August 2004 - July 2005).  In addition, the warning claimed that Plaintiff was not displaying a positive demeanor on the selling floor, failed to maintain his area of responsibility and was not inputting accurate information in connection with clientele capturing.  It concluded, "Frank must meet the performance standards as discussed in his annual review.  Further disciplinary action may be taken if standards are not met within the next 30 days."  Liriano signed this form on September 3, 2005.  (Barango-Tariah Aff. Ex. 2 at 115.)  Plaintiff refused to sign the form.  (Id.)

On or about July 10, 2006, Plaintiff's annual review evaluation form was completed, this time by Plaintiff's direct supervisor, Matthew Banks ("Banks"). Plaintiff continued to exceed the "Sales Productivity" goal, but again fell short of the thank you note goal of 1523, sending out only 646, and his clientele capture rate was 57%.  (Barango-Tariah Aff. Ex. 2 at 116-117; Marazio Aff. ¶ 20.)  Plaintiff received more "2's" as compared to past annual reviews, in exactly half of the categories, including "Write and send thank you notes" and "Follow clientele capture standards," and he received a "2" overall.  Banks further indicated that the evaluation would be followed-up in 30 days.  Plaintiff refused to sign this form.  (Barango-Taria Aff. Ex. 2 at 116-117.)

Plaintiff was issued a third "Preliminary Warning," dated July 28, 2006, by Banks.

The warning indicated that Plaintiff had failed to meet performance standards for the 2006 review period  (August 2005 - July 2006) and largely repeated the issues raised in the previous warning given nearly one year before, including Plaintiff's failure to achieve the thank you note and clientele capture rates, his demeanor, and his failure to maintain his stock assignment and keep the sales floor clean.  The form indicated, "Further disciplinary action may be taken if the standards are not met within the next 30 days."  Banks signed the form on September 16, 2006. Plaintiff refused to sign the form.  (Barango-Tariah Aff. Ex. 2 at 118.)  This warning was accompanied by a chart with numbers indicating, inter alia, Plaintiff's failure to meet the thank you note or clientele capture rate goals month by month for the 2006 review period.  Plaintiff's handwritten but undated initials appear next to each month's figures.  (Id. at 119-20.)

On October 15, 2006, Banks verbally admonished Plaintiff for failing to ensure that four different styles of pajamas were represented on the floor.  Banks memorialized this conversation in a "Note to File."  (Saulitis Decl. Ex. I at 121.)  Plaintiff testified that only one style of pajamas was actually missing on the floor.  (Cretella Dep. at 378:11-13.)

On October 19, 2006, Plaintiff was issued a "Final Warning."  Signed by both Banks and Defendant Maria Loccisano, a manager in human resources (Marazio Decl. ¶ 42), the warning indicated, "Since being placed on Preliminary Warning on 9/16/06, Frank has failed to achieve the following objectives."  The listed objectives included ensuring that the entire sales floor was clean, maintaining the daily stock assignment, and exhibiting a positive demeanor.  In addition, the warning stated that Plaintiff was issuing thank you cards photocopied from the same pre-written card, including 78 cards issued in this way in the previous month.  Plaintiff refused to sign this warning.  (Barango-Tariah Aff. Ex. 2 at 122.)

On or about October 24, 2006, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC").[5]  Counsel for Plaintiff promptly informed John Marazio ("Marazio"), who had been hired as Vice President of Human Resources at Bergdorf on October 3, 2006 (Marazio Decl. ¶ 1; Barango-Tariah Aff. Ex. 2 at 135), of this fact.  (Marazio Decl. Ex. K.)

On November 7, 2006, Banks wrote Loccisano and Liriano an e-mail indicating that Plaintiff had "not shown any substantial improvement in the area[]s we discussed with him, when we put him on Final Warning."  (Barango-Tariah Aff. Ex. 2 at 124.)  According to the e-mail, Plaintiff's clientele capture rate was at 59%, he only sent out 60 thank you cards in the previous month when he was supposed to write 134, and all 60 thank you cards were photo copies of the same note.  The e-mail also included charges that Plaintiff failed to maintain his stock assignments and attached the October 15, 2006, Note to File concerning the pajamas incident.  (Id.)

On November 21, 2006, Banks made another Note to File, indicating that Plaintiff failed to give him any thank you cards that month, obtained client information for only six people in two weeks and did not obtain any e-mail addresses.  Banks also noted that Plaintiff's sales area was in disarray, in that shirts were on the floor and over the hanging bar.  (Saulitis Decl. Ex. I.) Banks e-mailed the Note to File to Loccisano on the same day, asking for her opinion (Barango-Tariah Aff. Ex. 2 at 130), and again asked Loccisano via e-mail on November 27 whether there

---

[5]      Plaintiff asserts in his opposition papers that this charge was filed on October 10, 2006.  (Opp'n at 17.)  However, the deposition testimony cited by Plaintiff in support of this assertion does not indicate this date.  (See Cretella Dep. at 388:21-23 ("Q: So I understand, when did you bring an EEOC complaint?  A: I think it was October '06.").)

was any "update" on Plaintiff.  (Id. at 132.)  The record is not clear as to what, if anything, Loccisano did in response to Banks's e-mails.

On November 31, 2006, Banks recorded a Note to File, indicating that Plaintiff had failed to submit receipts to the auditing department, and instead left the receipts in the register drawer.  According to the note, failing to submit the receipts properly could have resulted in accounting problems or in a customer's successful challenging a particular charge.  (Barango-Tariah Aff. Ex. 2 at 134.)  The following day, Banks submitted this Note to File to Loccisano, asking for guidance.  (Id. at 133.)  The record is not clear as to what, if anything, Loccisano did in response to Banks's e-mail.

On December 1, 2006, Marazio met with Plaintiff to discuss Plaintiff's charges of discrimination, of which Marazio had been informed via the October 2006 letter from Plaintiff's attorney.  Plaintiff told Marazio, inter alia, that "discrimination is blatant and rampant in the Men's store and [] anyone can see it," that "everyone is held to a different standard based upon their race and ethnicity."  (Barango-Tariah Aff. Ex. 2 at 135; Cretella Dep. at 333:1-334:23.)

At or about this time, Marazio reviewed the records of Plaintiff's performance and the various warnings and observed no indication of improvement.  He also saw examples of the thank you cards written by Plaintiff, which were either photocopies of a single, generic note, or did not actually thank the customer for anything, and were, in Marazio's opinion, sloppily written.  (Marazio Decl. ¶ 31.)  Marazio ordered Plaintiff's termination and directed that Loccisano inform Plaintiff of Bergdorf's decision on December 7, 2006.  (Id. ¶ 42.)  Both Loccisano and Liriano informed Plaintiff of the decision that day.  (Cretella Dep. at 290:12-21.)  According to Marazio, he did not consult Defendants Liriano, Spaniolo, or Loccisano or ask for

their opinions in arriving at his decision, but relied primarily on the aforementioned

documentation as well as input from Plaintiff's immediate supervisor at that time, Banks.

(Marazio Decl. ¶ 39.)  Plaintiff "certainly believe[d]" and it was his "impression," however, that

Liriano must have had a say in his termination because "everyone was aware that there was very

little in the men's store that went on that wasn't personally approved by Nelson [Liriano]."

(Cretella Dep. at 291:23-292:22.)  He did not know whether Spaniolo played any role in the

termination decision.  (Id. at 317:18-21.)

Plaintiff was not technically replaced, as other sales associates' assignments were

modified to cover his responsibilities.  (Marazio Decl. ¶ 32.)  The record does not indicate the

respective race or ages of these other associates.


*Alleged Falsification and/or Inaccuracy of Annual Reviews and Warnings*

Plaintiff asserts that the numbers concerning his clientele capture rate and the

number of thank you notes sent out, as indicated on the annual reviews and various warnings,

were either falsified or inaccurate, and cites portions of his deposition testimony to support his

position, as follows.

He testified that the evaluations and other documentation upon which his

termination were purportedly based were "filled with inaccuracies."  (Cretella Dep. at 390:23-

24.)  Plaintiff testified that he had "no way of verifying a lot of the [information in the]

evaluation," because the performance evaluations were conducted "ridiculously late" in

comparison with the date actually indicated on the evaluations, at times nine months to one year

later.  (Id. at 391:4-12; 282:10-20.)  He testified that he discussed the 2006 annual evaluation,

dated July 10, 2006, sometime in September 2006 (id. at 46:3-50:22), but he did not provide any other specific examples of review delays or indicate exactly when other evaluations were reviewed with him relative to the dates indicated on the forms.[6]  Plaintiff did not explain which document was reviewed nine months or one year later than the indicated date, in light of the fact that most of the documents at issue were dated less than six months prior to his termination. Plaintiff testified that, because the evaluations were not timely, he was not made aware of the goals he was expected to achieve on a timely basis.  (Id. at 45:7.)

Plaintiff also bases his contention of falsification and inaccuracy on his testimony that he never had a meaningful opportunity to review the evaluation's contents when he eventually obtained copies of them, or when they were actually presented to him.  Plaintiff testified that at each annual review, he was only permitted to take a quick look at the actual Sales Associate Evaluation form when he was asked to sign it.  On two occasions, Plaintiff asked Liriano for copies of the forms, but Liriano refused to provide them (Cretella Dep. at 109:6-112:6); at other times, Plaintiff was told by managers (the names of whom Plaintiff does not specify) that copies would be provided, but they were not.  (Id. at 286:17-287:3.)  Similarly, although Plaintiff's initials appear next to each month's figures for the 2006 review period, Plaintiff testified that he initialed all of the months' figures at one time, several months after the fact.  (Id. at 282:10-20.)  Moreover, Plaintiff testified that there were "constant problems in the collection of data" because, in 2005, Bergdorf adopted a new computer system which resulted in

---

[6]     Plaintiff did not specifically explain whether the 2004 evaluation or first Preliminary Warning review sessions were delayed.  As noted above, the signature dates on both the 2004 evaluation and the first Preliminary Warning indicate unambiguously that Plaintiff and the respective supervisors signed these forms on the same dates.

"all sorts of problems getting up-to-speed" with all the categories listed in the evaluations.  (Id. at 401:24-402:5.)

With respect to the thank you card counts generally, he testified that he recalled providing about a hundred thank you cards a month (which would equal 1200 cards a year, far exceeding the numbers reported during his tenure, which ranged roughly from 400 to 800 a year), and that his supervisors were generally "pleased" with his thank you card numbers.  (Cretella Dep. at 260:19-23.)  Plaintiff also testified to having a "mental note" as to his thank you card count, that he always exceeded the thank you card count of other sales associates, and that his supervisors, including Banks, always gave "approval" for his thank you card numbers.  (Id. at 280:8-16.)  Plaintiff admitted that he had no written record of his thank you card numbers but testified that he could "certainly estimate for the last year that it was more than a thousand cards easily."  (Id. at 281:2-4.)  Moreover, Plaintiff asserted that it was "obvious" to him that the reported numbers did not account for notes that were sent out to inform customers of special sales, such as 50 or 80 notes that went out for a summer sale, even though the associates were assured they would be counted.  (Id. at 240:3-19.)  He did not provide any evidentiary basis for these beliefs.  He also does not proffer any evidence that he specifically disputed the thank you card numbers with any Defendant during his employment at Bergdorf.

With respect to the 2005 annual review specifically, Plaintiff disagreed with Liriano's negative ratings and complained to a senior manager named Bill Brobston ("Brobston") about those ratings.[7]  (Cretella Dep. at 392:6-10.)  Plaintiff also reported to Brobston that he "felt

---

[7]     Brobston's precise job description is not clear from the record, nor is it material to this Opinion.

that Nelson [Liriano] had discriminatory motives and a subjective evaluation" and that he "fudge[d]" some numbers[8] such that Plaintiff received low ratings in the more subjective categories.  (Id. at 395:15-23.)  Plaintiff testified that Brobston informed him on or about November 2005 that "the negative evaluation was reversed" and that he "didn't have to worry about it."  (Id. at 101:13-19; 104:6-10.)  The record is otherwise unclear as to what transpired from Plaintiff's conversation with Brobston.  (Id. at 237:1-10.)  Notwithstanding his generalized testimony concerning the purported inaccuracies of the evaluation, Plaintiff could not tell whether there were any statistical inaccuracies in the 2005 evaluation (i.e., reported thank you card count and clientele capture rate).  (Id. at 237:17-21.)  Plaintiff also points out that Liriano was no longer Plaintiff's direct supervisor as early as February 2004, but nonetheless was assigned to conduct his 2005 review in the summer of that year.

        In connection with the 2006 evaluation, Plaintiff testified that Banks and another manager told Plaintiff that he had a "great year and the performance evaluation is not reflective of that."  (Cretella Dep. at 391:20-24.)  Plaintiff testified that he had verbally disputed the accuracy of the evaluation at the time of the review but could not recall at his deposition what aspects he had disputed.  (Id. at 238:24-239:4.)  He testified that the thank you note number was "grossly inaccurate" and "ridiculous," as he had turned in "much more than" 646 thank you notes.  (Id. at 239:11-19.)  Although he did not have a precise count, he "estimate[d]" that it

---

[8]        Plaintiff did not specify exactly what numbers he believes were "fudged."  (See Cretella Dep. at 395:15-23 ("Well, I see in the report that Nelson gave me only a 3 out of a 5 rating on sales process and team work and I complained about those items to Bill Brobston.  I felt that they were not an honest evaluation.  They were subjective.  I felt that Nelson had discriminatory motives and a subjective evaluation.  He couldn't fudge the sales figures, but he could fudge those other things and he did.").)

would be "closer to the 1,523 [thank you card goal] than the 646" indicated in the review, on the

basis that he consistently did well in sales and "always made sure" that he sent "a lot of

notifications via the thank you note card" to his customers.  (Id. at 239:22-240:19.)  Plaintiff

testified that he always wrote the number of thank you note cards on a piece of paper rubber-

banded to the copies of thank you notes submitted to the manager.  (Id. at 241:6-9.)  He has not,

however, proffered copies of any such tallies.  Plaintiff testified that, when Loccisano informed

Plaintiff that he had not met Bergdorf standards in 2006, he told her that he "disagreed with that

hundred percent."  (Id. at 325:23-25.)  He also raised the issue of his disagreement again with

Brobston, but Brobston indicated that he did not want to get involved.  (Id. at 106:3-8.)

With respect to his contention that the clientele capture rates were inaccurate,

Plaintiff could not "recall anything with specifics."  (Cretella Dep. at 401:19-20.)

_Other Employees Hired, Promoted and Fired Allegedly on Account of Race/Age_

In support of Plaintiff's assertion that he was discriminated against because of his

age and race, Plaintiff testified that "more than a dozen other older employees" were fired on

account of their race and age, and presented the following examples.  (Cretella Dep. at 363:5-6).

Lloyd Kutler ("Kutler") was non-Hispanic,[9] over the age of 40, and was terminated during

Plaintiff's time at Bergdorf.  Plaintiff did not know if he was replaced.  (Id. at 187:18-188:8.)

Lloyd Thompson ("Thompson"), who worked on the second floor, was also non-Hispanic, over

---

[9]     Plaintiff did not specify the race of some of these individuals.  Because he
identified them in response to requests for examples of non-Hispanic employees
who were fired, the Court characterizes the race of these individuals as "non-
Hispanic."

the age of 40, and was terminated during Plaintiff's tenure.[10]  Plaintiff's "impression" of

Thompson, from working with or around him, was that he was "always an excellent salesman"

(id. at 363:25-364:5), but Liriano would be "relentless with him and just criticizing the most

minute . . . details of his work."  (Id. at 363:13-15.)  While it is not clear if Thompson was

"replaced," Anthony Cruz and Jacob Rapaldo, Hispanic individuals in their 20's, were hired or

promoted to the second floor at the time that Thompson left.  (Id. at 188:13-189:10.)  An

associate named "Bruce" was non-Hispanic, in his mid to late 40's, was terminated during

Plaintiff's tenure, and was replaced by Luis Cabrere, an Hispanic employee in his 30's.  (Id. at

189:11-23.)  Another associate, "Patrice," a non-Hispanic associate in his mid or late 40's, was

also fired but Plaintiff did not know if he was replaced.  (Id. at 189:24-190:10.)  Sabra Hunt, an

African-American employee in her 20's, was also terminated during Plaintiff's tenure.  It is also

not clear whether she was replaced.  (Id. at 190:11-20.)  Lastly, "Jack," an "older" white

associate, was fired in 2005 or 2006.  Plaintiff's "opinion" was that, "as an older white guy, he

was not among the favorite[s] at Bergdorf Goodman."  (Id. at 365:18-366:7.)  Plaintiff does not

proffer any evidence concerning the circumstances of the aforementioned terminations, the

ratings the fired individuals received in their annual evaluations, whether they received warnings,

their sales figures, or their clientele capture rates or thank you note statistics.

        Plaintiff also alleged that "less experienced," younger Hispanic employees were

---

[10]    It is unclear whether the first "Lloyd" referred to by Plaintiff near the start of the
deposition was the "Lloyd Kutler" or the "Lloyd Thompson" referred to by
Plaintiff towards the end.  (Compare Cretella Dep. at 187:18-188:10 with Cretella
Dep. at 362:19.)  For the sake of simplicity, the Court assumes that the first
"Lloyd" mentioned at the start of the deposition corresponds to "Lloyd Kutler"
while the second "Lloyd" mentioned corresponds to "Lloyd Thompson," as the
precise identities are not material to this Opinion.

"promoted over" him throughout his tenure, citing Jacob Rapaldo ("Rapaldo"), Anthony Cruz ("Cruz"), Anthony Aspuru ("Aspuru"), Luis Zambrano ("Zambrano") and Alberto Meliana ("Meliana") as examples.  (Cretella Dep. at 298:7-8; 353:14.)[11]  The record is not clear as to what Plaintiff meant by the term, "promoted over" (i.e., whether Plaintiff and these individuals applied for a certain promotion at the same time and a younger Hispanic employee was promoted instead of Plaintiff, or whether these individuals were promoted by Bergdorf, on its own accord, to positions for which Plaintiff had previously applied).[12]  Rapaldo was hired to work in the Zegna clothing section of the second floor, considered to be more lucrative and prestigious than the first floor sales area (id. at 354:4-13), but Plaintiff did not officially apply for the position after being told that he had to seek the promotion through Liriano.  (Id. at 361:2-23.)  Plaintiff did not explain his characterization of Rapaldo as "less experienced."  Aspuru was hired to work on the first floor but, within six months of being hired, Aspuru was promoted to the Zegna department of the second floor sometime in 2006.  Plaintiff did not know whether Aspuru had any experience prior to being hired at Bergdorf (id. at 354:14-356:17) but, based on Plaintiff's experience from working near and around Aspuru, Plaintiff believed that Aspuru was "not very experienced in selling luxury clothing."  (Id. at 356:23-24.)  Plaintiff heard rumors that Zambrano was "selling below a lot of his colleagues" and "had trouble making sales volume" in late 2003 (id. at 345:7-346:7), yet Zambrano was often encouraged by Liriano to sell on more

---

[11]     The record suggests that "Anthony Cruz" and "Anthony Aspuru" may be the same person.

[12]     Plaintiff did testify that he applied for a promotion to the third floor in 2004, and was rejected, but acknowledged that none of these identified individuals were promoted to the third floor.  (Cretella Dep. at 298:19-299:4.)

lucrative or prestigious floors, while Plaintiff was threatened by Liriano if he tried to do the same.  (Id. at 341:7-11.)  Throughout late 2003 and early 2004, Liriano frequently told Plaintiff that Zambrano was a "real salesman," and that Plaintiff should watch him and learn how to sell. (Id. at 341:4-12.)  Zambrano was eventually demoted in 2005 or 2006.  (Id. at 343:22-344:5.) Plaintiff proffers no specifics with respect to Cruz or Meliana, except that Meliana worked with Plaintiff in the right pit area and, according to Plaintiff, Meliana "was rarely there," because he was at a fitness club or elsewhere.  (Id. at 136:9-11.)  Plaintiff does not proffer any other evidence concerning the circumstances of these individuals' alleged hires or promotions, nor does Plaintiff proffer any evidence of the ratings these individuals received in their annual evaluations, whether they received warnings, their actual sales figures, or their clientele capture rates or thank you note statistics.

*Comments by Individual Defendants and Others*

Plaintiff also proffers evidence of comments allegedly made by the individual defendants -- Liriano, Lucciano and Spaniolo -- and others during his time at Bergdorf.

Nelson Liriano, as indicated previously, was Plaintiff's direct supervisor when he began his employment at Bergdorf in September 2003, and was promoted to a group manager on the second floor in February 2004.  Liriano drafted the June 2005 Preliminary Warning, the July 2005 annual review form, and the August 2005 Preliminary Warning.  According to Plaintiff, starting in late 2003, Liriano "began to harass" and "belittle" Plaintiff frequently and mention "that the front door was a revolving door," that Plaintiff was "welcome to go out [of] it any time," and that Plaintiff "could be replaced very easily."  (Cretella Dep. at 340:21-341:2.)  As

discussed earlier, Liriano also frequently praised Zambrano in front of Plaintiff and permitted Zambrano to sell on more lucrative floors than Plaintiff.  Plaintiff does not proffer any evidence of Liriano making any comment about his race or age, or about Zambrano's race or age.  (See, e.g., id. at 353:2-5 ("Q: Were any references made in any of those communications to Luis Zambrano's race or to your race?  A: No, I don't believe so.").)

       Maria Loccisano, as indicated previously, was a manager in the human resources office.  In late 2003, Plaintiff went to Loccisano to complain about an assistant manager who Plaintiff contended had used "harsh and abusive" language towards him, but Loccisano responded "harshly" towards Plaintiff and questioned whether Plaintiff himself was at fault. (Cretella Dep. at 199:16-200:3.)  Whenever Plaintiff complained to Loccisano about evaluations she had signed, she "threatened [his] job" and "didn't seem receptive at all to anything" he had to say to her.  (Id. at 200:5-9.)  These conversations were often followed up by conversations with Liriano, in which Liriano would also "threaten his job."  (Id. at 200:19-24.)  Plaintiff did not see the assistant manager direct harsh and abusive language towards his Hispanic colleagues.  He acknowledged that none of the language directed towards him contained any reference to his race, nor is there any evidence that the language referenced his age.  (Id. at 201:7-16.)  Loccisano did not make any reference to Plaintiff's race or age in the 2003 conversation, and Plaintiff proffers no evidence of comments by Loccisano referencing his race or age at any time thereafter. (Id. at 203:21-204:4.)  According to Plaintiff, Loccisano "was complicit in all of [Liriano's] hiring of these young Hispanic guys and the firing of all these older people."  (Id. at 205:9-13.) When asked for the basis of Plaintiff's professed knowledge, Plaintiff testified, "It's based on what I think."  (Id. at 205:18.)

Margaret Spaniolo was general manager of the men's store until June 2006, after which she became a senior vice president and general merchandise manager.  (Marazio Decl. ¶ 41.)  Sometime in the late summer or fall of 2006, Plaintiff had a conversation with another associate in which Plaintiff was told that Spaniolo, in a conversation with Liriano and a head buyer, had indicated that she wanted to have a younger work force in the men's store.  (Cretella Dep. at 179:24-180:4.)  Plaintiff proffers no evidence disputing Marazio's averment that Spaniolo had no say in his decision to terminate Plaintiff.  (See, e.g., id. at 317:18-21 ("Q: Do you know if Margaret Spaniolo was a decision-maker in the decision to terminate you?  [Pl.'s Counsel]: Objection.  A: No.").)

Plaintiff also proffers deposition testimony concerning Darlene Rodriguez ("Rodriguez"), a supervisor of cash banks and credit card receipts, who was responsible for handing out cash in the morning to sales associates and supervising the shipping and gift wrap stations.  Plaintiff contends that Rodriguez was "vicious and rude" to him on a regular basis although she was nice to Hispanic employees, and that she often prioritized the tasks of Hispanic employees, such as Meliana or Zambrano, over Plaintiff's tasks.  (See generally Cretella Dep. at 213:3-228:9.)  Liriano was present during several times when Rodriguez made hostile remarks to Plaintiff.  (Id. at 212:2-12.)  Plaintiff, however, could not "recall her speaking in racial terms."  (See id. at 229:2-3.)  Plaintiff also proffers no evidence that Rodriguez had any role in the decision to terminate Plaintiff.  (See, e.g., id. at 317:22-25 ("Q: Do you know if Darlene Rodriguez had anything to do with the decision to terminate your employment?  A: No.").)

DISCUSSION

Plaintiff asserts essentially that Defendants effectively demoted Plaintiff in November 2003 to work in the less lucrative right pit area of the first floor and terminated Plaintiff in December 2006 as a result of his race and age.  He also asserts that the termination was retaliation in response to Plaintiff's complaining of discrimination to Brobston in September 2005, and in response to the filing, in October 2006, of the EEOC charge.  Defendants seek summary judgment dismissing Plaintiff's claims in their entirety.

Summary judgment will be granted in favor of the moving party if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment carries the burden of demonstrating that there is no genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Material facts are ones that could potentially affect the outcome of the suit; factual disputes that are irrelevant or unnecessary will not be considered.  Id. at 248.  If the moving party can then show that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," it has carried its burden.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  If the moving party has satisfied its burden, the non-moving party must present evidence to show that there is a genuine material factual issue to counter the summary judgment motion.  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("[T]he party opposing the motion for summary judgment bears the burden of responding only after the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact.") (citations omitted).  The non-

moving party "must do more than simply show that there is some metaphysical doubt as to material facts" to defeat the motion.  Caldarola, 298 F.3d at 160.

Disparate treatment and retaliation claims brought under Title VII, the ADEA, and Section 1981 are analyzed under the three-step burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Jetter v. Knothe Corp., 324 F.3d 73, 75 (2d Cir. 2003) (applying burden-shifting analysis to ADEA case); Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (applying burden-shifting analysis to retaliation claims); Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004) (same substantive standards apply for Title VII and Section 1981).[13]

Although the NYCHRL, like Title VII, the ADEA and the NYSHRL, prohibits employment discrimination on the basis of age and race as well as retaliation for complaining of alleged discrimination,[14] it "explicitly requires an independent liberal construction analysis in all

_____

[13]    Plaintiff's discrimination claims under the NYSHRL are subject to the same standard of proof as claims under Title VII.  See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000).  Although the individual Defendants may not be sued under Title VII, the Court will refer to "Defendants" in the plural when addressing their arguments, as Bergdorf's arguments in the Title VII context are equally applicable to Plaintiff's discrimination and retaliation claims invoked under the other statutes as against all Defendants.

[14]    See N.Y. Charter & Admin. Code § 8-107(1) ("It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age[ or] race . . . [,] to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.").

_____    See N.Y. Charter & Admin. Code § 8-107(7) ("It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii)

circumstances, even where State and federal civil rights laws have comparable language.  The

independent analysis must be targeted to understanding and fulfilling what the statute

characterizes as the [NYCHRL's] 'uniquely broad and remedial' purposes, which go beyond

those of counterpart State or federal civil rights laws."  <u>Williams v. The New York City Housing

Authority</u>, 872 N.Y.S.2d 27, at *3-*4 (N.Y. App. Div. 2009).  "[I]nterpretations of State or

federal provisions worded similarly to [NYCHRL] provisions may be used as aids in

interpretation only to the extent that the counterpart provisions are viewed 'as a floor below

which the City's Human Rights law cannot fall, rather than a ceiling above which the local law

cannot rise', and only to the extent that those State- or federal-law decisions may provide

guidance as to the 'uniquely broad and remedial' provisions of the local law."  <u>Id.</u> at *4 (citing

Section 1 of the Restoration Act of 2005).

       The Court will first apply the <u>McDonnell-Douglas</u> burden shifting framework to

Plaintiff's other discrimination and retaliation claims, and then address separately Plaintiff's

NYCHRL claims.  Any reference hereinafter to discrimination or retaliation claims generally

concerns Plaintitff's non-NYCHRL claims unless otherwise stated.


<u>*Racial and Age Disparate Treatment Claims*</u>

       Plaintiff must first establish a <u>prima facie</u> case of discrimination.  <u>McDonnell

Douglas</u>, 411 U.S. at 802.  To establish a <u>prima facie</u> case of discrimination under Title VII or the

ADEA, Plaintiff must come forward with evidence addressing four factors: 1) he belonged to a

_____

       filed a complaint, testified or assisted in any proceeding under this chapter,
[etc.]").

protected class, 2) he was qualified for the position, 3) he suffered an adverse employment action, and 4) there were circumstances giving rise to an inference of prohibited discrimination. Id.

Here, it is undisputed that Plaintiff belonged to a protected class with respect to his race and age, and that his termination constituted an adverse employment action.  The Court further finds that Plaintiff's undisputed sales numbers suffice to at least create a genuine issue as to whether he met the basic qualification requirements for his job, and that Plaintiff's proffers as to the loss of commission volume earned upon his assignment to the less lucrative right pit area create a genuine issue as to whether his assignment in November 2003 to the right pit area was an adverse employment action.  See Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) ("Examples of [adverse employment action] include . . . a demotion evidenced by a decrease in wage or salary, . . . or other indices unique to a particular situation.") (citation omitted).

To demonstrate a basis for an inference of discrimination at the prima facie stage, Plaintiff has a "minimal" burden.  See McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d. Cir. 2001).  Plaintiff need only show that he was replaced by someone outside his protected class or show that a similarly situated employee was treated differently than him, though the prima facie proof required in a given case ultimately depends on the specific facts in question.  Id.

With respect to his assignment to the right pit area, Plaintiff has failed to proffer any evidence that would be sufficient to support the inference of discrimination element of his prima facie case.  Plaintiff's opposition papers do not even advance an argument that there is circumstantial evidence in the record giving rise to an inference of prohibited discrimination.  It is undisputed that Plaintiff was not replaced when he was assigned.  Plaintiff's proffered

testimony that Liriano assigned him to the right pit area[15] with the intent to cause Zambrano, a

Hispanic associate, to increase his sales in the center pit area is based purely on speculation.[16]

Nor can an inference of discrimination be drawn from the proffer that Hispanic associates in the

center pit area naturally earned more commission from the removal and non-replacement of

Plaintiff since, of the two associates remaining in the center pit area who are identified in the

record, one was white (Sirico) and one was Hispanic (Zambrano).  No rational fact-finder could

conclude from the record that Zambrano necessarily obtained a share of the increased

commission in the center pit area greater than that obtained by Sirico solely because Plaintiff was

reassigned, and there also nothing in the record indicating that Zambrano's earned commissions

actually increased at a rate greater than Sirico's.  Plaintiff proffers no evidence as to whether

other employees not in Plaintiff's protected classes were similarly situated in all material respects

to Plaintiff at the time of the assignment, and whether such similarly situated employees were

also assigned to less lucrative sales areas.  That an Hispanic associate also worked in the

allegedly less lucrative right pit area further undermines the propriety of any discriminatory

inference.  Because Plaintiff has failed to identify any circumstantial evidence that would support

an inference, sufficient to satisfy his prima facie burden, that his assignment constituted

---

[15]    Although Plaintiff never testifies explicitly that Liriano was the one who
reassigned him, the Court assumes for purposes of this analysis, from the fact that
Liriano was Plaintiff's direct supervisor at the time of the reassignment, that
Liriano at least had a say in the reassignment.

[16]    The proffered fact that Liriano repeatedly praised Zambrano in front of Plaintiff,
where there is no evidence that any of Liriano's comments referenced Zambrano's
race or age or Plaintiff's race or age, is insufficient to support any reasonable
inference that Liriano reassigned Plaintiff to the right pit area in order to increase
the sales of Zambrano specifically.

prohibited discrimination, Defendants are entitled to judgment as a matter of law on Plaintiff's

disparate treatment claims premised on the November 2003 reassignment.

As to Plaintiff's termination, however, Plaintiff has satisfied, albeit barely, his

prima facie burden in demonstrating a legitimate basis for an inference of prohibited

discrimination.  Although Plaintiff was not replaced, and the race and age of the associates whose

responsibilities were expanded to make up for his departure are not proffered, Plaintiff does

describe a pattern of firing non-Hispanic, older sales associates, and of hiring or promoting

Hispanic, younger sales associates, some to positions that the fired employees once held, during

his tenure at Bergdorf.

Once a plaintiff has made out a prima facie case, the burden shifts to the employer

to offer some legitimate, nondiscriminatory reason for its actions.  McDonnell, 411 U.S. at 802.

"This burden is one of production, not persuasion," Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 142 (2000), and the Court's analysis at this stage can involve no credibility

assessment of the evidence.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).  At this

stage, the employer does not need to prove by a preponderance of the evidence that the rationale

was not discriminatory, but must simply present a clear explanation for the action.  Gibbs v.

Consol. Edison Co. of N.Y., Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989).  Finally, if the employer

meets this burden, the plaintiff is required to show that the stated reasons are pretexts for

prohibited discrimination.  Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000).

Defendants have amply satisfied their burden.  Defendants point to all of the

documentation discussed above, including the evaluations indicating Plaintiff's persistent failure

to reach the target clientele capture rate and thank you card goals over the course of many years,

and the several preliminary warnings flagging these issues, in addition to, inter alia, Plaintiff's negative demeanor and his issuance of thank you notes that were previously photocopied rather than handwritten and personalized.  Accordingly, the burden shifts back to Plaintiff to point to evidence in the record that could reasonably support a finding that Defendants' proffered legitimate, nondiscriminatory reasons for terminating Plaintiff were mere pretexts for discrimination on the basis of race or age.

In attempting to frame a genuine issue of fact with respect to pretext, Plaintiff relies heavily on his contention that the documents upon which the proffered legitimate, nondiscriminatory reasons are based were falsified and/or inaccurate.  However, Plaintiff's contention is based almost entirely on Plaintiff's own conclusory disagreement with the numbers indicated in the documents.  Plaintiff has thus failed to demonstrate how the dispute over whether the documents were falsified or accurate is sufficiently genuine to survive summary judgment.  See Chi Ho Lin v. New York City Admin. for Children's Services, No. 99 Civ. 10314 (LAP), 2003 WL 21973361, *9 (S.D.N.Y. Aug. 19, 2003) ("the non-movant cannot avoid summary judgment through conclusory allegations or denials, but instead must bring forward some affirmative indication that his version of relevant events is not fanciful") (citation and quotation omitted).  Plaintiff's generalized references to data problems in connection with Bergdorf's transition to a new computer system in 2005, without any evidence as to what sorts of problems were encountered or specific examples of computer errors, fail to raise any reasonable inference that Plaintiff's numbers were materially inaccurate or falsified.  Brobston's alleged statement that the "negative evaluation was reversed" does not at all suggest that the statistics recorded in the evaluation that year were materially incorrect, and the suggestion that Liriano in

particular falsified the evaluations because of the incomplete circles around various "3" ratings is wholly speculative.  The fact that Liriano conducted the 2005 review when he was no longer Plaintiff's direct supervisor also raises no reasonable inference of falsification or material inaccuracy, since Plaintiff proffers no evidence that a group manager of the second floor at Bergdorf would be unqualified to conduct a reliable review of a sales associate working on the first floor.  Plaintiff's testimony as to evaluations reviewed months after they were recorded is largely conclusory, and the single instance of the 2006 annual review being conducted two months after the underlying form was drafted raises no genuine issue for trial since the proffered fact that evaluations are recorded months before they are reviewed with an employee supports no reasonable inference that the data was materially incorrect or falsified.  Plaintiff does not proffer any evidence with respect to the evaluation process or the process of obtaining relevant data that would suggest any significant problems with proper data compilation.

　　　　　Plaintiff's testimony that he actually wrote 100 thank you notes per month (which would result in an annual rate of 1200 thank you notes, far exceeding the numbers actually reported), that he "easily" wrote over 1000 thank you notes a year, and that he "estimate[s]" that he was "closer" to the thank you card goal in 2006 than the evaluation form indicates, while slightly more specific, is nonetheless conclusory, self-serving and unsupported by any other evidence.  Plaintiff also proffers no evidence rebutting Defendants' contention that Plaintiff was terminated in part because many of Plaintiff's thank you notes were not handwritten, but were copies of a single pre-written note.

　　　　　Plaintiff's assertion that certain supervisors generally praised his work and that he consistently maintained a high sales volume is not disputed by Defendants, but these facts are

immaterial in that they do not contradict Defendants' proffered reasons for terminating him, nor do they raise any reasonable inference of pretext.  Even if Plaintiff's sweeping and vague assertions that his "supervisors," including Banks, were "pleased" with or "approved of" Plaintiff's thank you card numbers were sufficiently concrete to be construed as an adequate proffer on Defendants' motion for summary judgment, these generalized positive comments, none of which are attributed specifically to Marazio, do not render Defendants' proffered reasons for termination sufficiently incredible as to suggest pretext to a rational fact-finder.  Plaintiff conceded that there was no basis for contesting the clientele capture numbers, and there is not a scintilla of evidence of deliberate falsification.  For all these reasons, and on the basis of the Court's review of the entire record, the Court concludes that no rational fact finder could find that the documents upon which Defendants' based their termination decision were deliberately falsified or materially inaccurate.  Therefore, Plaintiff's attempt to create a genuine issue of material fact as to pretext fails to the extent it is premised on the possibility of such a finding.

　　　　　Even if the above proffers could reasonably suggest that some of the data was less than perfectly accurate, termination on the basis of inaccurate data does not reasonably support an inference of termination on the basis of race or age where, as here, Plaintiff proffers no evidence to suggest <u>affirmatively</u> that the proffered business reasons were a pretext for termination on the basis of prohibited factors.  Plaintiff relies on his contention that "less experienced," younger Hispanic employees were hired or promoted while older non-Hispanic employees were fired, but Plaintiff fails to offer any evidence that the allegedly younger, Hispanic individuals were similarly situated to Plaintiff or any of the older, non-Hispanic employees.  There is no evidence that any of the younger Hispanic employees referenced in the

record, for example, had similarly failed to attain Bergdorf's target clientele capture rate or to follow thank you note protocols and were not fired.  See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) ("To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects.").  Accordingly, Plaintiff's proffers of purported "comparators" fail to create a genuine issue of material fact.

Nor is there any genuine issue of material fact as to pretext when considering the evidence of various comments allegedly made by the individual defendants and others in the course of Plaintiff's employment.  The only comment having anything to do with race or age is attributed to Spaniolo, who allegedly talked about having a younger workforce, but Plaintiff proffers no evidence whatsoever to refute Marazio's averment that Spaniolo had no input whatsoever in the decision to terminate Plaintiff.  There is no evidence of what Spaniolo's specific duties and obligations were, or whether she ever played any role in the firing of sales associates, nor is there any evidence from which it could be reasonably inferred that she played such a role.  There is no evidence that Liriano, who was present when Spaniolo allegedly made that comment, agreed with her, and the mere fact that Liriano praised a younger, Hispanic employee repeatedly in front of Plaintiff also raises no reasonable inference that Liriano favored Zambrano because of his race or age.  Moreover, Plaintiff's proffer that Liriano played any material role in Plaintiff's termination is based solely on Plaintiff's vague "impression" of Liriano's sweeping influence, which is nothing more than speculation.  There is similarly no evidence that Loccisano or Rodriguez had any input in Marazio's decision to terminate Plaintiff, and therefore there is no genuine issue as to pretext in connection with Plaintiff's termination even if a rational fact-finder could conclude that Loccisano or Rodriguez harbored racial or age-

based bias.

For the above mentioned reasons, Plaintiff has failed to demonstrate that there is a genuine issue of material fact with respect to whether Defendants' proffered legitimate, nondiscriminatory reasons for terminating Plaintiff were merely a pretext for discrimination on the basis of race or age.  Defendants' motion for summary judgment is, therefore, granted with respect to Plaintiff's race and age discrimination claims.

*Retaliation Claim*

Plaintiff alleges that Defendants retaliated against him for complaining to Brobston in September 2005 about race and/or age discrimination, and for filing an EEOC charge in October 2006.  (Opp'n at 17.)  In order to establish a prima facie case for retaliation under Title VII, Plaintiff must satisfy four elements: 1) he engaged in a protected activity, 2) Defendants knew of the protected activity, 3) Defendants took adverse action against Plaintiff, and 4) a causal connection existed between the protected activity and the adverse employment action.  Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006).

While Plaintiff's complaints to Brobston concerning discrimination in September 2005 undisputedly constitute protected activity, he offers nothing more than the temporal proximity of the complaints to the termination to support his contention that he was terminated in retaliation for the complaints.  The termination in December 2006 occurred over fourteen months after the complaints.  Although "there is no bright-line rule which identifies the point at which temporal proximity between [protected activity] and the employer's alleged adverse employment

action becomes too attenuated, on summary judgment, to sustain a charge of retaliation," <u>Caruso v. Camilleri</u>, No. 04-CV-167A, 2008 WL 170321, *27 (W.D.N.Y. Jan. 15, 2008) (quoting <u>Gormon-Bakos v. Cornell Coop. Extension of Schenectady Cty</u>, 252 F.3d 545, 554-55 (2d Cir. 2001)), the Court follows the course set by other courts that have determined that the passage of similarly lengthy or even shorter periods of time precluded the plaintiff from satisfying the fourth prong of the <u>prima facie</u> test on summary judgment.  <u>See</u> <u>Gormon-Bakos</u>, 252 F.3d at 555 (citing cases); <u>Castro v. Local 1199</u>, 964 F. Supp. 719, 729 (S.D.N.Y. 1997) ("Courts have found that a lapse in time of this magnitude [one year] is insufficient to establish a causal connection"). Plaintiff proffers no evidence of retaliatory intent.  For these reasons, Plaintiff has failed to meet his <u>prima facie</u> burden for his claim that the termination constituted retaliation for his protected activities in September 2005, and those claims are accordingly dismissed as to all Defendants.

With respect to the filing of the EEOC charge in October 2006, Plaintiff proffers no evidence, nor does he even argue in his opposition papers, that any of the individual defendants knew that Plaintiff had filed the EEOC charge; the record only shows that Marazio received notice of the charge.  Accordingly, Plaintiff's retaliation claims against Liriano, Loccisano and Spaniolo, as premised on the EEOC grievance, must also be dismissed.

It is undisputed, however, that Bergdorf knew about the EEOC grievance, that Bergdorf terminated Plaintiff, and that the EEOC filing was a protected activity under Title VII. Moreover, the close proximity in time between the filing and Plaintiff's termination, approximately five weeks, suffices to satisfy the last prong of Plaintiff's <u>prima facie</u> burden.  <u>See</u> <u>Hernandez v. Kellwood Co.</u>, No. 99 Civ. 10015 (LTS), 2003 WL 22309326, *20 (S.D.N.Y. Oct.8, 2003) (finding that a time period of less than six months between Plaintiff's filing of

EEOC charge and her firing was sufficiently short to establish the fourth prong of the <u>prima facie</u> case).  Therefore, Plaintiff has satisfied his <u>prima facie</u> burden for his EEOC retaliation claim as against Bergdorf.

Defendants, however, have satisfied their burden of proffering legitimate, nondiscriminatory reasons for Plaintiff's termination, as already explained.  Therefore, the burden shifts back to Plaintiff to proffer some showing that these reasons were merely a pretext for retaliation by Bergdorf.

Plaintiff points to temporal proximity and his contention that the evaluation data was falsified or inaccurate in arguing that Bergdorf's proffered reasons were a pretext for terminating Plaintiff in response to his protected activity.  As already explained, however, no rational fact-finder could conclude from the record that the data upon which Bergdorf purportedly relied were falsified or materially inaccurate.  There is no proffer of any evidence, direct or circumstantial, that Bergdorf, or any Defendant, sought to punish Plaintiff for filing his EEOC charge.  No rational fact-finder could conclude, based solely on the fact that Plaintiff was terminated shortly after he filed his EEOC grievance, that his termination was based on his protected activity, especially given the lack of any genuine factual issue as to Defendants' proffer that Plaintiff had persistently failed to meet Bergdorf's goals for nearly three years.  <u>See</u> <u>Bell v. Rochester Gas & Elec. Corp.</u>, 540 F. Supp. 2d 421, 433 (W.D.N.Y. 2008) (although the "temporal proximity of these events [protected activity and termination] may be found to create an inference of retaliation for the purposes of [plaintiff's] <u>prima facie</u> case, without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext") (quoting <u>Simpson v. N.Y. State Dep't of Civil Servs.</u>, No. 05-1492-CV, 2006 WL

93011, *2 (2d Cir. Jan. 9, 2006)), rev'd in part on different grounds by No. 08-1999-cv, 2009

WL 1269581 (2d Cir. May 8, 2009); Thomas v. S.E.A.L. Sec., Inc., No. 04 Civ. 10248

(JSR)(GWG), 2007 WL 2446264, *14 (S.D.N.Y. Aug. 30, 2007) (same) (citing Quinn v. Green

Tree Credit Corp., 159 F.3d 759, 770 (2d Cir. 1998) (strong temporal connection and other

circumstantial evidence sufficient to create genuine issue of pretext)), adopted by 2007 WL

2844955 (S.D.N.Y. Sept. 28, 2007); Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 317

(6th Cir. 2001) ("temporal proximity is insufficient in and of itself to establish that the

employer's nondiscriminatory reason for discharging an employee was in fact pretextual").

Therefore, Plaintiff's claims of retaliation are dismissed insofar as they are asserted against

Bergdorf.  Even if Plaintiff had satisfied his prima facie burden as to the individual Defendants,

Plaintiff's retaliation claims as to them would similarly be dismissed for failure to create a

genuine issue as to pretext, for the reasons explained above.

    For these reasons, Defendants' motion for summary judgment is granted as to

Plaintiff's retaliation claims.


_NYCHRL Claims_

    As stated earlier, the Court construes and applies the NYCHRL independently

from Plaintiff's other state and federal claims.  Having reviewed the record separately with

respect to Plaintiff's NYCHRL claims while keeping in mind the NYCHRL's "uniquely broad

and remedial" purposes, the Court concludes that Plaintiff's proffers fail to frame any genuine

issue of material fact as to whether any Defendant assigned Plaintiff to the right pit area or

terminated him because of his race or age, or as to whether any Defendant took action against

Plaintiff in retaliation for Plaintiff's complaints to Brobston or the EEOC charge.  No rational fact-finder could consider the circumstances surrounding Plaintiff's reassignment to the right pit area and conclude that the reassignment was in any way because of race or age.  While Defendants have come forward with concrete justifications for Plaintiff's termination, Plaintiff proffers nothing more than conclusory denials and rampant speculation, which fail to support any inference of discriminatory or retaliatory conduct in light of Defendant's proffers.  Therefore, to the extent the NYCHRL is more liberal than its state or federal counterparts in permitting a plaintiff to recover based on claims of discrimination or retaliation, Plaintiff has still failed to frame any genuine issue of fact as to discrimination or retaliation, and Plaintiff's NYCHRL claims are dismissed.

*Unpaid Compensation*

Plaintiff does not discuss his unpaid compensation claim in response to Defendants' motion for summary judgment as to all of Plaintiff's claims, which includes an affidavit attesting to the full payment of all compensation to which Plaintiff was entitled, nor does the Court find any evidence in the record from which a rational fact-finder could conclude that Plaintiff was not properly paid.  Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's claims for unpaid compensation.

The Court has considered thoroughly all of Plaintiff's remaining arguments and finds them to be without merit.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted

in its entirety. The Clerk of Court is respectfully requested to terminate Docket Entry No. 21,

enter judgment dismissing the complaint, and close this case.


SO ORDERED.

Dated:        New York, New York
              June 16 2009

                                          LAURA TAYLOR SWAIN
                                          United States District Judge